IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 5, 2002

## STATE OF TENNESSEE v. MICHAEL E. BIKREV

**Direct Appeal from the Criminal Court for Davidson County
No. 2000-D-1984     Seth Norman, Judge**

---

### No. M2001-02910-CCA-R3-CD - Filed June 24, 2003

---

The Defendant was charged with and convicted of burglary. The trial court sentenced him to three years' incarceration. In this direct appeal, the Defendant argues (1) that the trial court erred by denying his motion for judgment of acquittal and (2) that the State did not establish a proper chain of custody concerning the stolen property in this case. Having reviewed the record, we conclude that legally sufficient evidence was presented at the Defendant's trial to support his conviction and thus that the trial court did not err by denying the Defendant's motion for judgment of acquittal. We also conclude that a proper chain of evidence was established for the recovered property in this case and thus that the trial court did not abuse its discretion by admitting the property into evidence. We therefore affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Kurt O. Kosack, Brentwood, Tennessee, for the appellant, Michael E. Bikrev.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Jason W. Lawless, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In November 2000, the Davidson County Grand Jury indicted the Defendant, Michael E. Bikrev, with burglary. Following a trial, a Davidson County jury found the Defendant guilty of the crime charged. The trial court sentenced him to three years' incarceration and ordered that the sentence be served concurrently with a sentence for a Williamson County conviction. In this appeal as of right, the Defendant argues (1) that the trial court erred by denying his motion for judgment of acquittal and (2) that the State did not establish a proper chain of custody concerning the stolen property in this case. Having reviewed the record, we affirm the judgment of the trial court.

The following evidence was presented at the trial in this case: Darcy Elizabeth Rowe testified that she was the manager of a Nashville area Stor-N-Lok facility located in Bellevue. She reported that in July 2000, Barbara and Bryan Maislin, who were renting a storage unit at the facility, reported a burglary to her. Rowe stated that she called the police to report the burglary, repaired the door to the Maislins' unit, and printed out "activity logs" to determine when the Maislins had last entered their unit. Rowe testified that surveillance tapes recorded by cameras on the Stor-N-Lok property showed "people walking into the facility and . . . a camera being moved toward the sky." She explained that the people captured on the tapes were Bryan Maislin accompanied by a male and a female. The surveillance tapes were shown to the jury. Rowe also reported that a photograph was obtained from the surveillance video which showed a hand pushing the surveillance camera up, and she stated a distinctive ring could be seen on the hand. She testified that the hand moved the camera on Friday evening, one minute and fifty-seven seconds after the people seen on the video entered the storage facility.

On cross-examination, Rowe testified that a section of the security gates around the Stor-N-Lok was down at the time of the burglary because of nearby construction. She stated that the temporary opening in the gates was generally blocked with construction equipment, that the area around the opening was muddy, and that vehicles could not pass through the opening. However, Rowe stated that it was possible for a person to walk through the opening.

Officer Ryan Lockwood of the Nashville Metropolitan Police Department testified that on July 30, 2000, he responded to a burglary scene at a storage facility in Nashville. Lockwood reported that he spent approximately an hour with the Maislins, who performed a visual inventory of the items taken from their storage unit. He also stated that he believed that the lock had been broken off of the door to the unit.

Bryan Maislin testified that he and his wife owned a home-based computer business which they operated from the Stor-N-Lok facility in Bellevue. He stated that shortly before the burglary in this case, he had placed an ad in the newspaper to sell a used computer, and the Defendant and his wife, Myra Bikrev, responded to the ad. Maislin testified that he set up an appointment with the Defendant and the Defendant's wife to see the computer at the storage facility on Friday, July 28, 2000. He recalled that when the Defendant and his wife arrived at the storage facility, another customer arrived shortly thereafter, and the Defendant and his wife elected that the Maislins serve the other customer first so that they could "look around." Maislin stated that while he showed the computer to the other customer, he saw the Defendant and his wife pass by and proceed to the rear of the facility.

Maislin testified that after the other customer left, the Defendant and his wife returned, and he showed them the computer, which he described as "an older model" Dell computer with a Dell monitor, a new keyboard and a mouse. He recalled that the Defendant indicated that the computer was for his wife to use for business purposes and that the Defendant told him that he and his wife lived in Franklin. Maislin stated that after viewing the computer, the Defendant and his wife decided to buy it and asked if he would accept less than the asking price of $300. Maislin reported that he

agreed to accept $275, and the Defendant and his wife handed Maislin three one-hundred dollar bills. Maislin stated that although he attempted to write a receipt for the purchase, the Defendant and his wife were "extremely reluctant" to share any personal information, such as their address and last name, and told him that they did not need a receipt. He told the couple that if the Defendant's wife planned to use the computer for business, she would need a receipt for tax purposes, but the couple still refused to accept a receipt. Maislin stated that they also refused to accept the change due from their payment. He reported that after the sale, he transported the computer to their car, closed and locked his rental unit, and left.

Maislin testified that after the sale, the Defendant and his wife called more than once about a problem they were having with the computer monitor that they had purchased from the Maislins. He stated that the Defendant first called on the evening of the sale. He testified that when the Defendant called, he told the Defendant that his wife would be "best suited to answer his questions" and asked if she could return the call, but the Defendant told Maislin that he would call back. The following day, the Defendant called again with the same question, but Barbara Maislin was not available to answer his question. Maislin again asked the Defendant if his wife could return the call, but the Defendant declined to give Maislin his phone number. Although the Defendant told Maislin that he would call back, he did not initially do so.

Maislin testified that on the Sunday evening following the sale of the computer to the Defendant and his wife, the Maislins discovered that their storage unit had been broken into. They contacted the police and reviewed surveillance tapes at the storage facility. Maislin testified that while watching the tapes, his wife noticed "a specific ring" on the hand which pushed the security camera up, and when he watched the tapes, he recalled seeing the ring on the Defendant's hand.

Maislin stated that after he noticed the ring, he received another call from the Defendant regarding the same computer problem. Maislin stated that he felt that the Defendant was calling "to find out . . . if [Maislin] kn[e]w anything," but he did not mention the burglary to the Defendant on the phone. Instead, Maislin and his family drove to Franklin, and while there, he called the Defendant at home, using the number he had retrieved from his caller ID. He told the Defendant that he and his family were in Franklin to see a movie and that they wished to stop by the Defendant's home to correct the computer problem. The Defendant initially did not want the Maislins to come to his house, telling Maislin "not even his mother knew where he lived," but he then told Maislin that he needed to speak to his wife, who was not home. However, Maislin stated that he heard the Defendant put the phone down and that he next heard the Defendant speaking to his wife. The Defendant then agreed that the Maislins could come to his home.

Maislin testified that when he arrived at the Defendant's home, the Defendant, who was waiting in the driveway, directed him regarding where to park. Bryan and Barbara Maislin then got out of their van, leaving their children inside, and conversed with the Defendant for a while so as not to appear suspicious. Maislin recalled that when he entered the Defendant's home, all of the rooms were closed off except one room, where the computer he and his wife had sold the Defendant was setting "on a newspaper over . . . to the side." Maislin also noticed "a very elaborate" computer

system nearby. Maislin testified that when they turned on the computer that he had sold the Defendant, the monitor screen was black, and Barbara Maislin suggested that they use the monitor from the other computer to determine what was wrong with the monitor. Maislin stated that as the Defendant switched the monitors, Maislin noticed a box of speakers in an adjacent room that was identical to a box that had been taken from his storage unit. He stated that the box was emblazoned with a distinctive logo, and he explained that the speakers in the box were not "normally in the general circulation" because they were discontinued; he reported that he had bought the boxes of speakers from a liquidator. Maislin testified that when the Defendant saw him looking into the adjacent room, the Defendant "quickly . . . grabbed the monitor and ushered [Maislin] out of the area." He stated that they then hooked up the other monitor, and when the computer was turned on, a screen saver in a different language came on the monitor. Maislin recalled that the Defendant quickly deleted the screen saver, as if he did not want the Maislins to see it.

Maislin stated that while they were working on the computer, his children came to the door and asked if they could look at the Defendant's pool behind the house, and the Defendant told them that they could. However, according to Maislin, the Defendant's wife became very agitated and nervous at this point and told them that there were "bad dogs in the back." Maislin told his children to get back into the van. Maislin stated that he then noticed the Defendant's ring, which was identical to the one in the video. He testified that the Defendant's wife saw him staring at the ring and became "very, very nervous and tense." Maislin stated that he and his wife then left, and as they were leaving, his wife mentioned that their storage unit had been "broken into." Maislin testified that they also checked for dogs as they left, but never saw any dogs in or around the home and never heard dogs barking.

Maislin testified that the Defendant later called the Maislins once or twice to find out "how the police investigation was going." He stated that the Defendant did not mention the computer monitor again. Maislin reported that the Defendant next called him, apparently after the police had visited the Defendant's home, to find out "what [Maislin's] problem was with him." Maislin testified that before he hung up on the Defendant, he told the Defendant, "I know what you guys did. . . . I don't want you calling here. I have nothing further to say to you. The police are handling it." Maislin reported that the Defendant then called back three more times, and each time, they engaged in basically the same conversation, which became more "heated" during each subsequent call. Maislin told the Defendant each time not to call back. Maislin stated that he got the impression that the Defendant kept calling to intimidate Maislin, and Maislin testified that the Defendant never denied being involved in the burglary during the calls. Maislin also testified that during one of the calls, the Defendant's wife got on another phone extension and told Maislin that she knew where he lived. He stated that she also told him, "The police were out here. They . . . couldn't find a turd in an outhouse. They didn't find your sh_t. You never will either." Maislin testified that the Defendant then told his wife to "shut up." Maislin testified that after the third call, the Defendant again attempted to call back, but Maislin did not answer the phone.

Maislin reported that in mid-October, he received a phone call from a detective, who indicated that the police had found the stolen computers. He and his wife went to the Williamson

County Sheriff's Department, where they identified the stolen items. He stated that he was able to identify the recovered items as items taken from his storage unit because they were identical to the stolen equipment, because many of the recovered items were still marked with stickers that he and his wife had placed on them, and because extra memory that had been added to some of the equipment was marked "Barb's Computer Works" with indelible ink.

Maislin reported that he and his wife had estimated that a total of nine or ten computers, three printers, five sets of speakers, four subwoofers, and five monitors had been stolen. He also stated that other smaller items were taken, such as mice, keyboards, and electrical wiring. Maislin estimated that the wholesale cost of the stolen items was $3,474.65 and that the retail value of the equipment was $7,171.00. He testified that only some of the stolen equipment was recovered and that all of the recovered equipment was damaged. He estimated that the value of the recovered equipment was approximately $1,370.00.

On cross-examination, Maislin testified that after he and his wife identified the equipment recovered by the police, the police asked him to take the equipment home to "dry [it] out." He stated that they did so because the police did not have the proper facilities to store the equipment. The police told the Maislins that if they noticed anything "significant" with regard to the computer equipment, they should contact the police. Maislin reported that the equipment was in his possession for approximately a twenty-four hour period before he returned it to the police. He stated that he and his wife returned the equipment to the police because once they were able to dry out the equipment, he and his wife noticed "information" on the computers and called the police.

Detective Tommy Jarrell of the Nashville Metropolitan Police Department testified that he worked in the Property Crime Section and stated that he investigated the burglary in this case. He reported that in August 2000, he accompanied other detectives to Williamson County to talk to the Defendant and his wife, who were suspects. Jarrell recalled that when they arrived at the residence of the Defendant and his wife, they knocked on the door several times, but no one answered the door. However, he stated that he saw "[s]omeone raise[] a blind up" on a window next to the door, look out, and close the blind. Jarrell testified that he and the other detectives left and returned approximately thirty minutes later to knock again. On this occasion, the Defendant's wife opened the door.

Jarrell stated that the detectives explained why they were there, and the Defendant's wife told them that her husband was in the shower. When asked where she had been when they had knocked previously, the Defendant's wife told the detectives that "they were out picking blackberries. . . . up on the hill . . . out in front of the house." The Defendant soon emerged, and the detectives walked outside to speak with him. When asked where he had been earlier, the Defendant responded that he was "out walking around the property and his wife was at home." When asked if they had been picking blackberries, the Defendant responded that they had not.

Upon questioning, both the Defendant and his wife denied knowledge of the stolen property, and they told the detectives that they were "welcome to look around." After the couple signed a

consent to search form, the detectives looked through part of the house. Jarrell testified that some of the rooms in the home had locks on them, and the Defendant and his wife told the detectives that other people lived in the rooms and that they did not have access to the rooms. The detectives did not find any of the stolen property in the part of the house to which they had access.

Detective William B. Cothran of the Nashville Metropolitan Police Department testified that he was assigned to the Criminal Investigation Division in the Property Crimes Section. He stated that he investigated the burglary in this case. He stated that he visited the Bellevue Stor-N-Lok, where the crime occurred, and viewed the surveillance tapes, noticing a distinctive ring on the hand that moved the surveillance camera. He stated that he met with the Maislins on August 1, 2000, at his office. The Maislins told him that they had been to the Defendant's residence, where they saw items that appeared to have been taken from their storage unit.

Cothran stated that on the following morning, he and other detectives went to the Defendant's residence. He testified that they knocked on the door of the home for approximately ten minutes. He recalled seeing one of the blinds on a nearby window "raise[] up and drop[] real quick." Cothran stated that they then knocked again and announced themselves as police officers, but there was no response. He reported that he and the other detectives next drove to a park near the home and waited there for approximately thirty minutes while watching the house. He explained that they wanted to see if anyone tried to leave. He stated, "We knew somebody was in the house; they just wouldn't come to the door."

Cothran testified that when they returned to the home and knocked, the Defendant's wife answered the door within minutes. Cothran recalled that she told the detectives that her husband was in the shower and that she and her husband had been on the hill near their home picking blackberries earlier that day. He mentioned to the Defendant's wife that the ring she was wearing had been captured by the surveillance camera on the Stor-N-Lok property, but the Defendant's wife denied moving the camera. Cothran testified that the Defendant then walked outside to speak to the detectives and told them that prior to taking a shower, he had been walking on his property, but his wife was at home. When told that one of the blinds had been raised, the Defendant said, "Well, I have a cat that does that sometimes," although Cothran testified that he did not recall seeing a cat at the Defendant's home.

Cothran stated that he also asked the Defendant about moving the surveillance camera at the Store-N-Lok facility, and the Defendant told Cothran, "I was just goofing off. I jumped up and pushed the camera up." Cothran testified that he challenged this assertion, pointing out that the surveillance camera was positioned twelve to fifteen feet off of the ground, and the Defendant responded, "I played athletics in high school." Cothran testified that on a later occasion when he asked the Defendant about moving the camera, the Defendant stated that he had climbed a concrete pole to reach the camera and denied having said that he jumped up to reach the camera.

Cothran testified that he asked to look around the Defendant's home, and the Defendant signed a consent to search form. Prior to conducting the search, Cothran told the Defendant's wife

that the Defendant had claimed that they had not been together when the detectives had visited the home thirty minutes earlier, but the Defendant's wife merely reiterated that they had been picking blackberries. Cothran reported that the detectives performed a cursory search of the home, but did not find anything matching the description of the property stolen from the victims. However, he stated that he did notice that the Defendant and his wife were wearing rings which matched the ring seen on the surveillance video.

Cothran testified that on October 10, 2000, he was notified that some computer equipment had been recovered not far from the Defendant's home. He determined through serial numbers that the computers were those stolen from the Maislins and contacted the Maislins. He stated that because of limited storage space at the Williamson County Sheriff's Department and because the computer equipment was damp, law enforcement personnel released the equipment to the Maislins so that the Maislins could repair the equipment. On the following afternoon, Cothran received a call from Bryan Maislin, who reported that he and his wife had found some evidence on the computers. The Maislins then returned to Cothran's office, where the detectives retrieved several items of evidence from the computers, including a fax cover sheet containing the Defendant's wife's name, address, and phone number. Cothran stated that the detectives then obtained warrants and presented the case to the grand jury.

Barbara Maislin testified that she and her husband had rented a storage unit that was burglarized in July 2000. She stated that when she and her husband discovered the burglary, they first attempted to contact the storage facility management and then called the police. She reported that the police responded to the scene, where they took photographs and dusted for fingerprints. Barbara Maislin testified that she and her husband initially estimated for the police how many items were missing and later discovered that at least one more item than initially suspected was missing.

Barbara Maislin further testified that she and the manager of the storage facility noticed a "trail of footprints that led out . . . onto the parking lot" on the rear side of the property where the fence was down. She described one set of the prints as medium-sized tennis shoe prints, another as a very small set of tennis shoe prints, and the third set as larger boot prints. She stated that the people who had created the footprints had made "multiple passes" to and from the storage unit. When she and the manager followed the footprints, they noticed that a surveillance camera on the premises had been moved. Barbara Maislin and the manager therefore viewed the surveillance tapes. She stated that they slowed the tapes down "frame-by-frame" and saw a hand pushing the camera up approximately two minutes after the Defendant and his wife entered the storage facility. She reported that when she went to the Defendant's home with her husband, she saw the Defendant and his wife wearing rings which matched a ring seen on the video.

Barbara Maislin testified that she and her husband were later contacted by Detective Ricky Hagan, who told them that the police had recovered some of their stolen property. She stated that they went to Hagan's office, where they saw part of the missing computer equipment, which they were able to identify by sight, by stickers they had placed on the equipment, by marks showing her company's name which they had placed on parts of the computers' memory, and by serial numbers.

She stated that the police allowed them to take the equipment, which was wet, home so that they could dry out the equipment. Barbara Maislin stated that at home, she allowed the equipment to dry for approximately twenty-four hours and then booted up the computers. When she did, she found new files and screen savers that had been created; the names "Mishoon," "Mishka," and Myra; "[t]hings called Lubof . . . , [and] Nefsata"; and other items that "weren't in a language [she] understood."[1] She stated that a total of twenty-eight new files had been added to the computers' memory during July and August 2000, while the computers were not in the Maislins' possession. She reported that one of the computers, from which the serial number had been removed, contained a file which included a fax cover sheet that listed information pertaining to the Defendant's wife. In addition, Barbara Maislin stated that the keyboard which she had sold the Defendant and his wife was recovered with the stolen items.

Johnny Tally, an employee of Bridgestone and a minister, testified that during October 2000, he lived at 3610 North Chapel Road in Franklin, Tennessee. He stated that on October 7, 2000, he was "bush-hogging [his] property" when he noticed three cardboard boxes at the edge of his fence line at the very back of his property. He stated that the boxes had been covered with garbage bags which were tightly taped and that they appeared to have been there for some time. He explained that he had not seen them before because the area where he found them was overgrown with weeds, grass, and blackberry bushes. Tally stated that he opened one of the boxes and noticed that it contained computer equipment. He went to his neighbor's house to find out if the boxes belonged to his neighbor, but the neighbor did not claim the boxes. Tally then called the police. While he was waiting for the police to arrive, he noticed six more boxes at the back of his property, all of which were sealed shut. When police officers arrived, they loaded the boxes into patrol cars.

Deputy Tomeka Sanders of the Williamson County Sheriff's Department testified that on October 7, 2000, she was dispatched to a "found-property call" at 3610 North Chapel Road. There, she met Johnny Tally, who showed her the boxes he had found on his property. She stated that the cardboard boxes were soggy, wrapped in plastic, and taped with duct tape. She testified that she opened a box and saw computer equipment inside. She then loaded all of the boxes into her patrol car and transported them to Detective Ricky Hagan at the Sheriff's Department. Sanders reported that she did not open any other boxes because she had been told that a burglary investigation involving some computers was ongoing, and she did not want to disturb any physical evidence.

Detective Ricky Hagan of the Williamson County Sheriff's Department testified that he participated in the burglary investigation in this case. He stated that on August 2, 2000, he accompanied Detective Cothran to the Defendant's residence, which was located on North Chapel Road in Franklin. He reported that he later received word from Deputy Sanders that she had located computer equipment on North Chapel Road, a little over a tenth of a mile from the Defendant's driveway, and he advised her to recover the items and meet him at the Sheriff's Department. He stated that when she arrived, they secured the property in a locked room.

---

[1] The record reveals that the Defendant is Ukranian.

The following Monday, he opened some of the boxes containing computer equipment and noted that the equipment was "very wet, water-damaged." He then contacted Detective Cothran and informed Cothran that they had located computer equipment. Cothran inspected the equipment, matched some of the serial numbers to his reports of the missing items, and contacted the victims. Hagan reported that after the equipment was inventoried, Detective Cothran and the victims signed for the property, and the property was turned over to the victims one or two days after it had been placed in the locked room. He reported that the computer equipment was never activated before it was released to the victims because the equipment was wet. Hagan stated that he told the victims to dry out the equipment and bring it back so that he could check the computer files for evidence. He testified that the victims returned the computers the following day.

Hagan testified that he had been trained regarding computer forensic data analysis, and he stated that he had handled all of the computer crime and internet investigations for the Williamson County Sheriff's Department for six years. When Hagan checked the computer files, he found the name "Myra" listed on one of the files and the name "Mishka" on another. He stated that he also found a fax cover sheet containing the name and address of the Defendant's wife, which was created on August 2, 2000, at 2:57 a.m. Hagan testified that the registry files for the computers he examined were activated on July 30, 2000, and he reported that the last date of activity on the computers was August 2, 2000, although he noted that the computers had been merely turned on on the day prior to his investigation of the computer files in October 2000. He explained that the computers had been booted up the previous day while in the possession of the Maislins. However, he stated no registry file changes had occurred while the computers were in the Maislins' possession.

On cross-examination, Hagan explained that registry files, which are activated when a computer is first turned on, create a log inside the computer software that shows when files are activated. He stated that the internal computer clock is set by the factory which manufactures the computer. He explained that the time on a registry file can be changed by changing the clock. He stated that in order to change the time on the registry files, the hard drive must be wiped clean, it must be reformatted, and all files must then be reloaded using the original factory software sold with the computer. He testified that this is called a "full restore," and he stated that new computers are usually sold with full restore disk. However, he stated that the software for the stolen computer equipment was never recovered, and he reported that the Maislins could not have changed the information stored in the recovered computers because they did not have the proper software to do so.

## I. JUDGMENT OF ACQUITTAL

The Defendant first argues that the trial court erred when it denied his motion for judgment of acquittal. See generally Tenn. R. Crim. P. 29. He contends that to transport the property from the Maislins' storage unit to Franklin would have required more than one trip, and he argues that no evidence was presented to show that the Defendant transported or could have transported the stolen property in more than one trip.

This Court has noted that "[i]n dealing with a motion for a judgment of acquittal, unlike a motion for a new trial, the trial judge is concerned only with the legal sufficiency of the evidence and not with the weight of the evidence." State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). The standard for reviewing the denial or grant of a motion for judgment of acquittal is analogous to the standard employed when reviewing the sufficiency of the convicting evidence after a conviction has been imposed. See State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995). An appellate court must apply this same standard when reviewing the denial of a motion for judgment of acquittal. Adams, 916 S.W.2d at 473.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was indicted for entering a "building other than a habitation or any portion thereof of Barb's Computer Works, not open to the public, with the intent to commit a theft" and without the effective consent of the property owner. See Tenn. Code Ann. § 39-14-402(a)(1). We conclude that legally sufficient evidence was presented at the Defendant's trial to support a conviction for burglary. The Maislins testified that when they showed the computer to the Defendant and his wife at their storage unit, the Defendant and his wife acted suspiciously, in part because they refused to reveal any personal information for a receipt. Bryan Maislin also saw the Defendant and his wife looking around the storage facility and proceeding to the back of the facility, where a gate was temporarily down. In addition, he testified that after the sale of the computer, the Defendant called several times, but refused to leave a number for Barbara Maislin to return his call. Bryan Maislin testified that he believed the Defendant was calling to determine whether the Maislins "kn[e]w anything."

Further evidence was presented indicating that when the Defendant went to the Maislins' storage unit to view the computer that the Maislins wished to sell, he moved the surveillance camera at the storage facility towards the sky, and, in fact, the Defendant himself admitted that he had done so. Barbara Maislin testified that after the burglary, she noticed three sets of footprints leading from her storage unit to a portion of the security fence around the storage facility that was down at the time of the burglary, and she stated that the people who had made the prints had made "multiple passes" from the storage unit to the fence.

Bryan Maislin testified that when he and his wife later visited the Defendant's home, he noticed a box containing speakers which was identical to a box that had been taken from his storage unit, and he testified that the Defendant and his wife again acted suspiciously. Specifically, Bryan Maislin described the Defendant's wife as "very, very nervous and tense." He further testified that after he reported the Defendant's and his wife's behavior to the police, the Defendant called several times and attempted to threaten him. He reported that during one of these conversations, the Defendant's wife stated, "[The police] didn't find your sh_t. You never will either."

Law enforcement officers, who went to the Defendant's home to speak to the Defendant and his wife, testified that although someone appeared to be home when they first knocked on the door, no one answered the door. They reported that the Defendant and his wife later provided conflicting accounts of where they were when the officers first knocked on their door. One detective also testified that the Defendant provided conflicting reports regarding how he had moved the surveillance camera on the storage facility property.

Finally, evidence was presented that a large amount of the stolen items were recovered from a location very near the Defendant's home. Personal information concerning the Defendant's wife was retrieved from a computer, and information in a language other than English was noted in the computer files. Detective Hagan testified that the last activity on the recovered computer equipment occurred on August 2, 2000, while the computers were not in the Maislins' possession. He further testified that the Maislins could not have changed the computer files during the brief time that they took the recovered equipment home because they did not have the software to do so. Finally, Barbara Maislin testified that the keyboard which she had sold the Defendant and his wife was among the recovered computer equipment. Because we conclude that this evidence is legally sufficient to support the jury's conclusion that the Defendant entered the Maislins' storage unit without their consent and with the intent to commit a theft, we conclude that the trial court did not err by denying the Defendant's motion for judgment of acquittal.

## II.  CHAIN OF CUSTODY

The Defendant next argues that the State failed to establish an unbroken chain of custody with regard to the recovered computer equipment. He contends that the chain of custody was broken when the Williamson County Sheriff's Department allowed the victims to take the recovered property home overnight. "As required by Rule of Evidence 901(a), it is 'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the

evidence or establish an unbroken chain of custody.'" State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000) (quoting State v. Holbrooks, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998)). The requirement of proving an unbroken chain of custody is to demonstrate that there has been no tampering, loss, substitution, or mistake regarding the evidence. State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). "The identity of tangible evidence . . . need not be proven beyond all possibility of a reasonable doubt, and the State is not required to establish facts which exclude every possibility of tampering." Scott, 33 S.W.3d at 760 (citations omitted). Moreover, the State's failure to call all witnesses who handled the evidence does not necessarily preclude the introduction of the evidence. State v. John Wayne Gray, No. M1999-01615-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 585, at *13 (Tenn. Crim. App., Nashville, July 28, 2000) (citing Braden, 867 S.W.2d at 758-59; State v. Holloman, 835 S.W.2d 42, 46-47 (Tenn. Crim. App. 1992); State v. Johnson, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1982)). Instead, evidence may be admitted "when the circumstances surrounding the evidence reasonably establish the identity of the evidence and its integrity." Scott, 33 S.W.3d at 760. Thus, the prerequisite for admission of evidence is reasonable assurance, rather than absolute assurance. State v. Leon Hurd, No. E1999-01341-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 262, at *49 (Tenn. Crim. App., Knoxville, Apr. 10, 2001). Whether the chain of custody is sufficiently established to justify its admission is a matter within the sound discretion of the trial judge, and the trial court's determination in this regard will not be overturned absent a clearly mistaken exercise of that discretion. State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987); Ritter v. State, 462 S.W.2d 247, 249 (Tenn. Crim. App. 1970).

In this case, Johnny Tally testified that he found the stolen computer equipment, which was boxed and sealed, on his property and called the police. Deputy Tomeka Sanders of the Williamson County Sheriff's Department responded to the call and transported the boxes of computer equipment, most of which were unopened, to the Sheriff's Department. Detective Ricky Hagan testified that he helped Deputy Sanders secure the property in a locked room at the Sheriff's Department. Hagan testified that he then contacted Detective William B. Cothran, who inspected the computer equipment, matched some of the serial numbers on the computers to his reports of missing items, and contacted the victims. The victims were able to identify the recovered equipment by sight, by serial number, and by stickers and marks which they had placed on parts of the equipment. Hagan reported that Detective Cothran and the victims signed for the property, and the property, which was wet, was released to the victims so that the victims could dry it out.

The Maislins testified that they transported the computer equipment home, dried it out, and noticed evidence in the computer files. Specifically, Barbara Maislin testified that she found twenty-eight new computer files that had been created while the computers were not in the Maislins' possession and a fax cover sheet containing information regarding the Defendant's wife. Bryan Maislin testified that approximately twenty-four hours after he and his wife received the computer equipment from the Williamson County Sheriff's Department, they returned the equipment to Detective Cothran. Detective Cothran verified that he received the equipment from the Maislins, and Detective Hagan verified that the Maislins returned the equipment on the day following its release. Nothing in the record suggests that the equipment was removed from the custody of the

Williamson County Sheriff's Department between the time the Maislins returned the equipment and the time of trial.

Detective Hagan testified that he checked the computer files and noted the fax cover sheet and file names initially found by Barbara Maislin. He also testified that aside from an indication that the computers had been merely activated on the day prior to his analysis of the files, while the computers were in the Maislins' possession, the last date of activity on the computers was August 2, 2000.

We conclude that the State established a sufficient chain of custody of the recovered stolen property to justify its admission into evidence. It presented testimony by each witness who had possession of the property from the time of its recovery until the time of trial. Although the victims possessed the recovered property for approximately twenty-four hours, there is no indication of tampering, loss, substitution, or mistake regarding the recovered property. See Braden, 867 S.W.2d at 759. We therefore conclude that the trial court did not err by allowing the property into evidence.

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE